James **DAVIS**, Administrator of the
Estate of Dorothea Davis,
Deceased

v.

**LOWER BUCKS HOSPITAL**

v.

Allen W. **SKRENTA, M. D.**

v.

Augusto S. **ADRID, M. D.**
and
H. Earle **Tucker, M. D.**

James **DAVIS**, Administrator of the
Estate of Dorothea Davis

v.

Aldo **CALO, M. D.**

Civ. A. Nos. 70–2631, 71–507.

United States District Court,
E. D. Pennsylvania.

Aug. 14, 1972.

Thomas B. Rutter, Philadelphia, Pa., for plaintiff.

William V. Coleman, Philadelphia, Pa., for Calo & Skrenta.

A. Grant Sprecher, Philadelphia, Pa., for Tucker.

E. Paul Maschmeyer, Philadelphia, Pa., for Adrid.

## MEMORANDUM AND ORDER

DITTER, District Judge.

These two actions are companion malpractice cases. Plaintiff has filed a motion to compel certain defendants to answer questions posed during discovery depositions.

James Davis alleges that he was infected with hepatitis and became a patient at Lower Bucks Hospital. He was discharged without having been cured, and thereafter, infected his wife who subsequently died. It is plaintiff's theory that the defendants were negligent for failing to diagnose and treat him and for failing to immunize Mrs. Davis. The present suits were brought to recover damages resulting from her death.

At deposition, three doctor defendants refused to answer a variety of questions at the instruction of their attorneys. These questions are listed on the appended exhibit. Numbers 1 through 29 were posed to Aldo Calo, M.D., Numbers 30 through 46 to Allen W. Skrenta, M.D., and Numbers 47 through 49 to H. Earle Tucker, M.D.

■■ A plaintiff has a right to depose a doctor-defendant, both as to facts he knows and the opinions he holds. Nevertheless, an inquiry concerning the opinions of a physician is subject to certain limitations:

1. The information sought must pertain to matters within the doctor's area of expertise;

2. Hypothetical questions must be based upon facts of record, for example, the testimony of a witness who has been subjected to cross-examination;

3. A physician cannot be asked to give an opinion unless it is based upon a complete statement of all relevant facts; and

4. A question at deposition should not be so broad that it will elicit a medical treatise, or be so probing that it cannot be answered without access to a medical library.

Sixteen of the questions to Dr. Calo should have been answered. The others were improper for the following reasons:

(1) Questions 2 and 18 would require a medical treatise;

(2) Questions 15 and 16 require research in a medical library. The same is true of Question 4 if the last word was intended to be "percent" rather than "persons." If the intended word was "persons," the question is ambiguous.

(3) Questions 9, 13, 14, 20, and 21 are too broad. Although they might not require answers that would amount to medical treatises, they go beyond the facts in the instant case.

(4) Question 17 is misleading. If a "stone" had not shown up on x-ray, its absence on subsequent x-rays would not indicate that it had been passed.

(5) Questions 27 and 28 require the assumption of a fact not established.

Only three of the questions to Dr. Skrenta were proper. The others need not be answered for the following reasons:

(1) Questions 30, 35, 36, 37 and 40 are too broad and go beyond the facts of the instant case.

(2) Questions 31, 38, and 46 were hypothetical questions not based upon facts of record.

(3) Question 39 was based upon the observations of other doctors who had not testified or been made available for cross-examination.

(4) Question 41 would require access to a medical library.

■ (5) Questions 42, 43, 44, and 45 require answers which explain medical and legal theories. While this information should be made available through answers to interrogatories, it is unfair to expect a doctor to provide such answers on deposition. See Lance, Inc. v. Ginsburg, 32 F.R.D. 51, 53 (E.D.Pa.1962).

None of the questions in issue which were posed to Dr. Tucker need to be answered. All of them were hypothetical in nature, not based upon facts of record. In addition, Question 47 asked whether a physical condition could conceivably exist. As such, it asks for a speculative answer.

## ORDER

And now, this 14th day of August, 1972, for the reasons set forth in the foregoing memorandum,

A. It is Ordered that Aldo Calo, M.D., appear before the officer chosen to take his deposition at such time and place as plaintiff may designate on twenty days written notice and answer

under oath the questions on the attached appendix numbered 1, 3, 5 through 8; 10 through 12, 19, 22 through 26, and 29.

B. It is Ordered that Allen W. Skrenta, M.D., appear before the officer chosen to take his deposition at such time and place as plaintiff may designate on twenty days written notice and answer under oath the questions on the attached appendix numbered 32 through 34.

## APPENDIX

ALDO CALO, M.D.

Question

1. Would you tell us, please, based upon your experience and your training and your knowledge, what are the symptons which you look for in order to make a diagnosis of hepatitis? (P. 13)

2. Based upon your experience and training, Doctor, will you tell us, please, the means by which infectious hepatitis is transmitted from one person to another. (P. 14)

3. You agree, do you not, Doctor, that the administration of gamma globulin to one who has been exposed to infectious hepatitis will, in all likelihood, modify the effect of the hepatitis on that person should they subsequently incur it? (P. 14)

4. You would agree, would you not, Doctor, that the fatality rate for infectious hepatitis is in the range of from two to five persons? (P. 15)

5. You would agree, would you not, Doctor, that if gamma globulin is administered to a person and he, as a result of that, incurs sub-clinical hepatitis, he then has a life-long immunity from infectious hepatitis, doesn't he? (P. 15)

6. But as a general matter, a matter of general medical science, the values would be following on the several tests and the symptoms would be alleviated, would they not? (P. 34)

7. And if the laboratory values did not come down, it would indicate, would it not, Doctor, that it was not a common duct stone, but some other condition? (P. 34–35)

8. What is the significance of the change in bilirubin value from 13 to 16.9 over the course of about 18 days? (P. 44)

9. That was down from the thymol turbidity reading of 19.5 on February 12th. Does that have any diagnostic significance, sir? (P. 44)

10. In Mr. Davis's case, does that have any significance, sir? (P. 44)

11. Doctor, has your opinion changed since you saw Mr. Davis? Does it [difference in variation] have any significance to you as you sit here today? (P. 45)

12. As you sit here today, does that difference [in values in the bilirubin tests] have any diagnostic significance to you? (P. 46)

13. Doctor, have you ever, on your own motion, by your own order, had gamma globulin administered to the members of the household of any patient suffering from hepatitis? (P. 52)

14. Is it your opinion, sir, that gamma globulin need not be administered or should not be administered to a household of one suffering from infectious hepatitis? (P. 53)

15. Would you tell me, sir, the medical authority upon which you base your suggestion that the administration of gamma globulin as a prophylactic agent is a matter of controversy? (P. 53)

16. By what percentage are there such stones which do not appear on ei-

ther X-ray or barium X-ray? (P. 59)

17. Doctor, if there had in fact been a common duct stone, the results of these X-rays would indicate, would it not, that it had been passed by February 8th of 1970? (P. 60)

18. That is what I had tried to ask earlier, Doctor, and your lawyer wouldn't let you answer, the treatment for hepatitis is what? (P. 60)

19. Was that [whether he was living with anyone at the place where he was living] of any significance to you, sir? (P. 65)

20. According to your training and experience as a physician, Doctor, when a person suffers from infectious hepatitis, do you consider it important to find out whether or not they are living with someone in the same household? (P. 65)

21. Do you consider it good medical practice, Doctor, to administer gamma globulin or some other prophylactic agent to the members of one's household from one suffering from infectious hepatitis?

22. Doctor, would you tell us, please, why you did not put down the diagnosis of hepatitis as one of the final diagnoses on the face sheet of that record? (P. 69)

23. When Mr. Davis was discharged from the hospital, you knew, did you not, Doctor, that he was suffering from infectious hepatitis? (P. 69)

24. Doctor, it is a fact, is it not, that serum hepatitis can not be transmitted orally, it can only be transmitted parenterally, whereas infectious hepatitis can be transmitted orally; isn't that right, sir? (P. 70)

25. Doctor, would you tell me, please, why you did not administer gamma globulin to Mrs. Dorothy Davis? (P. 70)

26. And Doctor, at what point in time did Mr. Davis recover from his infectious hepatitis, if ever? (P. 71)

27. And up until what point in time, Doctor, was Mr. Davis a carrier of infectious hepatitis? (P. 72)

28. Was Mr. Davis still a carrier of infectious hepatitis as of March 26th when you saw him last? (P. 72)

29. Was Mr. Davis a carrier of infectious hepatitis when you saw him last in the hospital on February 18th? (P. 72)

ALLEN W. SKRENTA, M.D.

Question

30. Have you ever ordered those tests run as part of your emergency room practice at Lower Bucks Hospital? (P. 28)

31. Did you consider that it would be desirable to have those tests run if Mrs. Davis were admitted as an inpatient to the hospital? (P. 29)

32. Did you, in your conversation with Dr. Adrid mention the possibility of the need for further laboratory tests such as the bilirubin or the SGOT or the SCPT test? (P. 29)

33. Did you consider the desirability or the necessity for such a blood test? (P. 29)

34. And you knew, did you not, that the principal means is by way of orally; isn't that right? (P. 30)

35. On a Negro patient such as Mrs. Davis, is there any way of finding a symptom of jaundice by visual observation other than jaundiced eyes? (P. 30)

36. Doctor, in your duty at the emergency room on Sunday nights and Wednesdays as you have described it, at any time during the three months—let's do it this way, beginning with January 1, 1970 down until the date when you saw Mrs. Davis, had you seen any indications of hepatitis in the emergency room of Lower Bucks Hospital? (P. 30–31)

37. Have you ever made a diagnosis of hepatitis in the emergency room of Lower Bucks Hospital or at any other hospital facility where you have been working? (P. 31)

38. Doctor, if you had made the diagnosis of infectious hepatitis with Mrs. Davis that night, would you have made an inspection—(P. 31)

39. You knew, in your examination of the Women's Medical College Hospital records, don't you, Doctor, that Mrs. Davis suffered from infectious hepatitis? (P. 31)

40. Doctor, are you familiar with the proper treatment for infectious hepatitis when the diagnosis is once made? (P. 32)

41. Now Doctor, are you acquainted with the mortality rate for infectious hepatitis in the United States? (P. 32)

42. Doctor, through your lawyer in this case, you have filed some papers with the court in which you charge that Dr. Adrid and Dr. Tucker or either of them was careless or negligent in the treatment of Mrs. Davis. In the first charge you lay against them, Doctor, it is failing properly to diagnose or identify the condition or conditions from which Dorothea Davis suffered.

Would you tell me please, sir, all these facts on the basis of which you make that charge? (P. 32)

43. The second basis on which you charge, through your lawyer Doctors Adrid and Tucker of carelessness or negligence is that—in that failing properly to treat the condition or conditions from which Dorothea Davis suffered.

Would you tell me, please, all the facts on which you base that charge, Doctor? (P. 32–33)

44. And the third category, Doctor, the same charges are careless negligence and negligence against Dr. Adrid and Dr. Tucker is in that they failed properly to care for the condition or conditions from which Dorothea Davis suffered.

Would you tell me, please, all the facts on which you based that charge? (P. 33)

45. The fourth category, Doctor, is that Dr. Tucker and Dr. Adrid were careless and negligent in failing to exercise due care in the examination and treatment and care of Dorothea Davis.

Would you tell me please, all the facts on which you base that charge? (P. 33–34)

46. You don't have any doubt, do you, Doctor, that if the diagnosis of hepatitis had been made on Wednesday by you in Lower Bucks Hospital that Mrs. Davis would have lived? (P. 34)

## H. EARLE TUCKER, M.D.

Question

47. Based upon your experience and training, Doctor, is it conceivable that eyes could go from not jaundiced at all to markedly jaundiced in seven hours? (P. 23)

48. Would you agree with me, Doctor, that if jaundice had been diagnosed on the 13th in your hospital and appropriate treatment

had been rendered, then Mrs. Davis would have lived? (P. 24)

49. Doctor, in your medical opinion, would it have made any difference if her jaundice or hepatitis had been diagnosed in your hospital at about 6:15 or 6:30 when you saw her on the 16th of April? (P. 24)